UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

First-Citizens Bank & Trust Company
of North Carolina,

      Plaintiff,

v.

Outsource Services Management,
d/b/a Presidium Asset Solutions,

      Defendant.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-1734 ADM/FLN

John C. Ekman, Esq., and Daniel N. Sacco, Esq., Lindquist & Vennum PLLP, Minneapolis, MN, on behalf of Plaintiff.

Jerome A. Miranowski, Esq., and Michael M. Krauss, Esq., Faegre Baker Daniels LLP, Minneapolis, MN, on behalf of Defendant.

Paul L. Ratelle, Esq., Fabyanske Westra Hart & Thomson, PA, Minneapolis, MN, on behalf of Plaintiff-Intervenor Arvest Bank.

## I.  INTRODUCTION

On July 26, 2012, the undersigned United States District Judge heard oral argument on Plaintiff First-Citizens Bank & Trust Company of North Carolina's ("First-Citizens") Motion for Temporary Restraining Order [Docket No. 3]. Defendant Outsource Services Management ("OSM") received notice of the motion and appeared in opposition.[1] For the reasons set forth below, the motion is granted.

## II.  BACKGROUND

This case concerns a $102 million construction loan for a water park resort in the State of

---

[1] Arvest Bank filed a Motion to Intervene [Docket No. 16], which was not yet ruled upon at the time of the hearing. By agreement of counsel, Arvest Bank argued in support of First-Citizens' motion.

Washington. The borrower of the loan is a joint venture between the Confederated Tribes of the Chehalis Reservation (the "Confederated Tribes") and Great Wolf Lodge, LLC (collectively, "CTGW"). Declaration of Brian Dougherty ("Dougherty Decl.") [Docket No. 9] ¶ 2. The loan was financed as a participation loan of sixty-six banks. Id. ¶ 6. The largest participant was Venture Bank, purchasing a $12 million share. Id. ¶ 7. The loan is administered by an administrative agent. The administrative agent was originally Marshall Financial Group LLC, but Defendant OSM replaced it as administrative agent in August 2009. Declaration of Michael Meyer in Supp. of Mot. for Temporary Restraining Order [Docket No. 6] ("Meyer Decl.") ¶¶ 3, 6.

In September 2009, the State of Washington closed Venture Bank and the Federal Deposit Insurance Corporation ("FDIC") was appointed receiver of Venture Bank's assets. Id. ¶ 7. Also, in September 2009, Plaintiff First-Citizens purchased from the FDIC substantially all of Venture Bank's assets, including Venture Bank's share in the construction loan at issue here. Dougherty Decl. Ex. 3 at 9. As part of First-Citizens' agreement to purchase those assets, First-Citizens and the FDIC entered into a loss-sharing agreement (the "Loss-Share Agreement"). Id. at 26. In the Loss-Share Agreement, the FDIC agreed to reimburse between eighty and ninety-five percent of any losses sustained by First-Citizens before September 2014 on commercial loans formerly held by Venture Bank. See id. at 9 (discussing Loss-Share Agreement and noting term for losses on non-real-estate loans is five years).

The maturity date of the loan is next Wednesday, August 1, 2012. Meyer Decl. Ex. A at 10. Presently, approximately $93.7 million of principal is outstanding. Dougherty Decl. ¶ 3. Of this amount, First-Citizens' share is approximately $11 million. Id. ¶ 7. Sometime in 2011, the borrower informed OSM that it would not be able to pay $93.7 million by August 1, 2012. Id. ¶

11. OSM circulated a Loan Extension Term Sheet that proposed extending the maturity date of the loan. Meyer Decl. ¶ 11, Ex. D § 3. Under the terms of the Administrative Agreement, which govern the administration of the loan, unanimous consent of participants entitled to vote is required to "extend the maturity date of the Credit or the scheduled payment of any principal, interest or other payment under the Credit Agreements beyond the then applicable Documented Payment/Maturity Date . . . ." Meyer Decl. Ex. B ("Administrative Agreement") § 3.5(a). In contrast, only a simple majority of participants is required for a "modification, waiver, forbearance, or indulgence under the Credit Agreements that is material but does not require consent of the Credit Providers" at the levels established in other provisions of the agreement requiring unanimous or super-majority consent. Id. § 3.5(c).

On March 22, 2012, First-Citizens objected to extension of the maturity date in the Loan Extension Term Sheet. Meyer Decl. Ex. E. With the borrower still anticipating default on August 1, 2012, negotiations recommenced. Dougherty Decl. ¶ 13. Executives of First-Citizens were involved in these negotiations, and proposed that the Confederated Tribes provide a 51% guaranty for the loan. Id. On June 21, 2012, OSM circulated a "Revised Term Sheet." Meyer Decl. ¶ 13. The Revised Term Sheet's provisions include a "forbearance period" equal in duration to the originally proposed extension of the maturity date. Meyer Decl. Ex. F § 3. However, the Revised Term Sheet expressly maintains the August 1, 2012 maturity date. Id. A proposed Agreement Regarding Loan was drafted from the Revised Term Sheet. Dougherty Decl. Ex. 4. The proposed Agreement Regarding Loan provides that CTWG will make monthly payments of $609,643.39 towards the unpaid principal balance of the loan. Id. § 3(c). The proposed Agreement Regarding Loan Revised also provides the unconditional 51% guaranty of the Confederated Tribes. Id. § 2(d).

First-Citizens voted against the proposed agreement. Meyer Decl. ¶ 15. Forty banks, or 68.9% of voting participation interests, voted in support of the proposal. Dougherty Decl. ¶ 17. On July 11, 2012, First-Citizens was informed that a majority had approved the proposal. Meyer Decl. ¶ 16. On July 18, 2012, First-Citizens commenced this action seeking a declaratory judgment that unanimous consent of the voting participants is required for the new agreement. On July 19, 2012, the present Motion for a Temporary Restraining Order followed. On July 23, 2012, OSM filed a memorandum of law in opposition.

### III. DISCUSSION

**A. Standard of Review**

First-Citizens seeks a temporary restraining order. Rule 65(b) of the Federal Rules of Civil Procedure contemplates the issuance of a temporary restraining order without notice to the adverse party, and Rule 65(a) provides that a preliminary injunction may issue only with such notice. Fed. R. Civ. P. 65. Therefore, a district court may convert a hearing for a temporary restraining order into a hearing for a preliminary injunction as long as the adverse party had notice of the hearing. Lifetime Fitness, Inc. v. Wallace, Civil No. 12-740, 2012 WL 1517262, at *2 (D. Minn. April 30, 2012) (citing Four Seasons Hotel & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 n.3 (11th Cir. 2003)). OSM had notice of the motion and has filed a memorandum and appeared at oral argument in opposition. Accordingly, the Court will consider First-Citizens' motion as one for a preliminary injunction.

In considering a preliminary injunction, courts apply the factors set forth in Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109 (8th Cir. 1981): (1) threat of irreparable harm to the movant; (2) harm to other parties if the relief is granted; (3) probability of movant's success on the merits; and (4) effect on public interest. Id. at 113. The movant "bears the burden of

establishing the necessity of this equitable remedy." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

**B. Dataphase Factors**

    **1. Threat of Irreparable Harm**

The parties vigorously dispute whether First-Citizens faces a threat of irreparable harm. Irreparable harm is a threshold requirement for preliminary injunctive relief. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987). Threat of irreparable harm requires more than a possibility of remote future injury, it requires a presently existing actual threat of injury. Rogers v. Scurr, 676 F.2d 1211, 1214 (8th Cir. 1982). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Rogers Group, Inc. v. City of Fayetteville, Ark., 629 F.3d 784, 789 (8th Cir. 2010) (quoting Gen. Motors, 563 F.3d at 319).

First-Citizens has demonstrated a threat of irreparable harm. First-Citizens avers without an injunction, the agreement in the proposed Agreement Regarding Loan will close, and its only remedy will be an action for rescission. Under New York law, however, rescission itself is an equitable remedy. Symphony Space, Inc. v. Pergola Props., Inc., 669 N.E.2d 799, 809 (N.Y. 1996) ("The remedy of rescission, moreover, lies in equity and is a matter of discretion.") (citation omitted). That First-Citizens must seek another equitable remedy should the present equitable relief be denied underscores the fact that no adequate remedy at law is available.

It is not disputed that if the proposed agreement were entered into, First-Citizens would lose the benefits of its Loss-Share Agreement with the FDIC. This is a significant injury, it reduces from between eighty to ninety-five percent down to zero the insurance against a loss on some $11 million that would benefit First-Citizens. This injury likely could not be remedied in

an action for damages for breach of contract. "Under New York law, damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003) (citation omitted). However, damages are limited to those "reasonably contemplated by the parties at the time of contract and definitely related to the breach." Borden v. Chesterfield Farms, Inc., 277 N.Y.S.2d 494, 496 (N.Y. App. Div. 1967) (citation omitted). The Loss-Share Agreement was not contemplated by the parties at the time of the contract, it did not arise until after the contract was entered into during an unforeseen time of instability in the banking industry. Moreover, because the Loss-Share Agreement is collateral to the loan at issue, it is arguable whether the loss of its benefits would be directly related to the new agreement.

Furthermore, the loss of the benefits of the Loss-Share Agreement is not a remote possibility, it is a certain present threat posed by the proposed forbearance. By its plain terms, the Loss-Share Agreement covers only losses incurred prior to September 11, 2014. The plain terms of the Revised Term Sheet, however, would extend the materialization of any loss under the loan to July 31, 2015, with an option for the borrower to further extend to July 31, 2017.

On the present record, there is nothing unlawful, nefarious, or illegitimate about the Loss-Share Agreement. At the time First-Citizens entered into the Loss-Share Agreement, the existence of the Administrative Agreement and its terms were known. Presumably, therefore, the terms of the Administrative Agreement formed some of the inducement for First-Citizens to purchase Venture Bank's assets. Rather than permanently deprive First-Citizens of the benefit of its bargain with the FDIC, a more equitable course with respect to this factor is to preserve the status quo until the legal rights of the parties under the Administrative Agreement can be fully determined. See Ferry-Morse Seed Co. v. Food Corn, Inc., 729 F.2d 589, 593 (8th Cir. 1984)

("The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief.") (citation omitted).  This factor weighs in favor of preliminary injunctive relief.

### 2. Balance of Harms

The next Dataphase factor is the balance between the irreparable harm to the movant, if any, and the injury granting an injunction will have on the other interested parties.  Dataphase, 640 F.3d at 113.  There is no dispute that the other participant banks will suffer injury if an injunction is granted.  At present, the borrower has indicated a default is certain.  The majority of participant banks have evinced their desire to mitigate the breach through the proposed Agreement Regarding Loan.  Granting the injunction will deprive them of this plan to mitigate their losses.  However, depriving them of that specific plan will not deprive them of any chance to mitigate losses or work out a new agreement with the borrower.  Negotiations have been ongoing since the borrower communicated it will default.  The borrower has indicated its willingness to make concessions, it agreed to increased interest rates and the Confederated Tribes agreed to a new guaranty, in an attempt to work out the default.  Furthermore, any injunction granted here will be temporary and create temporary harm to the participant banks favoring the proposed Amended Loan Agreement.  On the other hand, allowing the Agreement Regarding Loan to close will create permanent harm to First-Citizens.  Therefore, this factor also favors preliminary injunctive relief.

### 3. Likelihood of Success on the Merits

Through this action, First-Citizens seeks declaratory judgment that unanimous consent of the voting participant banks would be required to enter into the proposed Agreement Regarding Loan, and to enter into that agreement without unanimous consent would be a breach of the

7

Administrative Agreement. The ultimate success of that claim turns on the construction of the contractual language at issue.

Under New York law, "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." In re Metaldyne, 409 B.R. 671, 977 (Bankr. S.D.N.Y. 2009) (citations omitted). Here, the terms of the Administrative Agreement plainly state that unanimous consent is required to "extend the maturity date of the Credit *or the scheduled payment of any principal, interest or other payment under the Credit Agreements beyond the then applicable Documented Payment/Maturity Date*." Administrative Agreement § 3.5(a) (emphasis added). The plain terms of the proposed Amended Loan Agreement, however, schedule payments of principal and interest in $609,643.39 monthly installments. Under the plain meaning of the language of both documents, unanimous consent is required for this action. Under the original Loan Agreement, the entire outstanding balance of the loan is scheduled to be paid on August 1, 2012. Under the plain terms of the Administrative Agreement, therefore, unanimous consent is required to schedule any payments of interest or principal beyond that date. Yet, that is precisely what the Agreement Regarding Loan seeks to accomplish.

OSM's attempt to avoid this result is unavailing. At oral argument, OSM contended that the adjective "scheduled" caused the plain meaning of the phrase "scheduled payment" to refer only to the payments scheduled in the original Loan Agreement in reference to the last day of each LIBO Interest Period. Meyer Decl Ex. A (the "Loan Agreement") § 2.4(c),(d) (scheduling certain payments in reference to "Interest Payment Date"); id. at 9 (defining "Interest Payment Date" as the last day of each LIBO Interest Period). The plain meaning of the terms, however, belies that assertion. The ordinary meaning of "scheduled" refers to any payment due on a date

certain.  There is no reason to limit the meaning of "scheduled" to only particular subsections scheduling certain payments.  If the parties had intended to limit "scheduled" to only those payments scheduled in reference to the Interest Payment Date, they could have expressly referenced the Interest Payment Date, as they did elsewhere in their agreements.  Rather, their intent appears to concern extension of payments generally.  The language, referring to both the maturity date and scheduled payments and referring not only to payments of principal and interest but to "other payments" as well, by all accounts evinces an intent for the broad and not the limited meaning of scheduled payment.  Therefore, First-Citizens has shown a likelihood of success on the merits, and this factor also favors preliminary injunctive relief.

### 4. The Public Interest

The final Dataphase factor is the public interest.  Dataphase, 640 F.3d at 113.  Generally the public interest favors enforcing contracts.  Benfield, Inc. v. Moline, 351 F. Supp. 2d 911, 919 (D. Minn. 2004).  OSM argues the public interest does not favor an injunction because an injunction creates financial uncertainty that would jeopardize the employees of the water park resort and impose costs of the FDIC that would be at the public expense.  The FDIC does not receive congressional appropriations and whatever the source of its money, the FDIC agreed to the Loss-Share Agreement.  Who is the FDIC?, (July 27, 2012), http://www.fdic.gov/about/learn/symbol/index.html (FDIC receives no congressional appropriations); Dougherty Decl. Ex. 3 at 9 (FDIC agreed to terms of Loss-Share Agreement).  No public concerns are posed by imposing costs on the FDIC to which it has previously agreed.  The risk of job loss in the community where the water park resort is located is more concerning, but whether that is a real risk is not at all certain.  The foreclosure of the water park does not appear imminent.  First-Citizens has not asked to OSM to begin collection activities, Dougherty

Decl. Exs. 6, 7, and therefore some work-out plan to cure the impending default can still be crafted. The relief here is preliminary in nature, preserving the status quo while the rights of the parties may be determined. Against that backdrop, the financial uncertainty to the borrower does not seem so great that it would seriously jeopardize the employment of large numbers of individuals. Therefore, this factor also favors preliminary injunctive relief.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Plaintiff First-Citizens' Motion for Temporary Restraining Order [Docket No. 3] is **GRANTED**; and

2.  In light of the threat of irreparable harm to First-Citizens, the balance of harms to First-Citizens and other interested parties, First-Citizens' likelihood of success on the merits, and the public interest, as discussed above, Defendant OSM is hereby enjoined, without the unanimous consent of voting participant banks, from executing the Amended Loan Agreement or otherwise entering into the same or executing or entering into any other agreement that extends the maturity date or the scheduled payment of any principal, interest or other payment due under the Loan Agreement, and related documents, beyond August 1, 2012, until further Order of the Court.

BY THE COURT:

s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: July 27, 2012